DIXON, Justice.
In these consolidated actions Theodore L. Tannehill, Jr. seeks to establish judicially that he is not the father of Scott, the child born to Estelle Scott Southerland Tannehill.
One of the suits is an action en desaveu. The other is a separation suit by the wife in which disavowal is sought in a reconventional demand.
The child was born during the existence of a marriage between Theodore and Estelle. To avoid the presumption of paternity of C.C. 184, Theodore contends that his marriage to Estelle was a nullity because her prior divorce was a nullity. He contends that Estelle's -divorce in 1965 from Jerry H. Southerland in LaSalle Parish, Louisiana was an “absolute nullity” under the provisions of C.C.P. 3941, for the reason that neither Estelle nor Southerland was domiciled in LaSalle Parish, nor had the matrimonial domicile ever existed in that parish.
If the divorce is held to be valid, and marriage between Theodore and Estelle valid, he contends that the child is not his because of childhood diseases which resulted in his sterility.
The Court of Appeal ruled adversely to Theodore on both grounds, 247 So.2d 870; 247 So.2d 875.
The Court of Appeal agreed with the findings of fact of the district court, that Estelle actually resided with her sister in LaSalle Parish at the time of the suit for divorce against Southerland. The Court of Appeal found that there was no evidence to show that Southerland was at fault, and relied on a presumption that the judgment of divorce obtained by Estelle from Southerland was correct and that the court had jurisdiction. Since the party attacking the judgment has the burden to prove its nullity (Walsh v. Walsh, 215 La. 1099, 42 So.2d 860; Gennusa v. Gennusa, 189 La. 137, 179 So. 60; Succession of St. Ange, 161 La. 1085, 109 So. 909), the Court of Appeal held that Theodore Tan *938 nehill, Jr., seeking to annul the LaSalle Parish judgment, had the “burden to show that Mr. Southerland was not at fault and that the then Mrs. Southerland was not justified in establishing a separate domicile for herself in LaSalle Parish.” (See Bush v. Bush, 232 La. 747, 95 So.2d 298). Upon these presumptions, the Court - of Appeal concluded that Tannehill failed to establish the nullity of Estelle’s divorce from Southerland.
The artificial and arbitrary concept embodied in C.C.P. 3941 (that a divorce rendered in a parish where neither party was domiciled and where the matrimonial domicile was not located is an absolute nullity) will continue to force courts to resort to presumption, inferences and specious reasoning to sustain the legality of regular judicial proceedings and the legality of matrimonial unions regular in all respects except for the accident of Venue in a prior divorce proceeding. In our mobile society the breakup of marriages frequently sees the husband and wife depart for different parishes. When suit is filed in a court where the wife resides, but the wife is prevented from acquiring a domicile because her husband was not the guilty party in the dissolution of the marriage, and where the husband — desiring the divorce and filing an answer in the suit — does not live, and where the matrimonial domicile was not located, there is little to justify a “public policy” that says, “The judgment of divorce is an absolute nullity.” We agree with the Court of Appeal in its conclusion avoiding such an unjust result, and hold the LaSalle Parish judgment of divorce valid.
Tannehill’s allegations in the action en desaven are that he contracted mumps at the age of twelve “which was further complicated with encephalitis,” which resulted in an “impediment to the natural maturity of petitioner’s reproductive system,” and that he was “unable physically and biologically to produce spermatozoa.” The district court sustained an exception of no cause of action, and would not allow any proof of sterility on the trial of the consolidated cases. The first time this case reached the Court of Appeal, it affirmed the district court’s sustaining of the exception of no cause of action to the disavowal action. (226 So.2d 185).
Only two cases in Louisiana have been located in which a disavowal of paternity has been allowed: Kaufman v. Kaufman, La.App., 146 So.2d 199 and Singley v. Singley, La.App., 140 So.2d 546. In both cases, the child involved was born more than three hundred days after a judgment of separation had been rendered.
The Louisiana Supreme Court has never allowed a disavowal of paternity. From the results of numerous attacks on the paternity of children through the years (see Cavanaugh, “Action En Desaveu,” 23 L. *940 Law Rev. 759), it is apparent that the presumption of paternity in Louisiana has been rigorously applied. Article 184 of the Civil Code:
“The law considers the husband of the mother as the father of all children conceived during the marriage.”
Disavowal is prohibited when based on the “natural impotence” of the father. C. C. 185. Disavowal is prohibited when sought because of the adultery of the wife unless the birth of the child has been concealed from the father. C.C. 185; but see Trahan v. Trahan, La.App., 142 So.2d 571. Even in cases when the child is born prior to the one hundred eightieth day of marriage, disavowal is prohibited if the husband of the mother was acquainted with the circumstances of the pregnancy at the time of the marriage, or acknowledged the child at the registry of the birth or the baptism. C.C. 190. In all cases, even where the presumption of paternity ceases, the father is prohibited from disavowing his child unless he brings the action within a month of the birth or within two months after his return to the place of birth, or after the discovery of the fraudulent concealment. C.C. 191.
In spite of the presumption of paternity, the father is allowed to disavow the child when the mother has been guilty of adultery and the birth has been concealed from him. C.C. 185; but see Trahan v. Trahan, supra.
The presumption of paternity does not exist when the child is born before the one hundred eightieth day of the marriage, and does not exist with respect to children born more than three hundred days after the dissolution of the marriage or after judgment of separation. C.C. 186, 187.
Nor does the presumption of paternity exist when the husband has been so remote from the wife that cohabitation has been physically impossible.
The codal provisions prevent the disavowal of paternity except within extremely narrow limits, and then only if done promptly after the birth. The policy of the State, as found in the statutes and as perpetuated in the jurisprudence, has been to protect innocent children against attacks upon their paternity. Williams v. Williams, 230 La. 1, 87 So.2d 707.
The father’s argument is that the prohibition against disavowal on account of impotence of the husband does not prevent disavowal on account of the sterility of the husband, because: impotence and sterility are two different and well defined conditions; that it is possible for an impotent husband to conceive, but not scientifically possible for conception to result from the union of a woman with a “sterile” man.
Neither proposition can be sustained without equivocation. We are in a poor position to determine with precision what was understood by the French at the be *942 ginning of the 19th century by the term l’impuissance. The French made a distinction between “natural impotence” and “impotence due to an accident.” Exactly what was meant by accidental impotence is not clear to us now, and was not clear to Planiol. (See 1 Planiol, Civil Law Treatise, Part 1, No. 1433 (La.L.Inst.Trans.)). In the English language, prior to the 19th century, one meaning of “impotence” was “wholly lacking in sexual power.” The New Century Dictionary of the English Language, Appleton-Century.
Human impotence is a problem as old as Western civilization. (See Genesis 17:17, “Then Abraham fell on his face and laughed, and said to himself, ‘Shall a child be born to a man who is a hundred years old? Shall Sarah, who is ninety years old, bear a child?’ ”).
However, until modern times, failure to procreate was “generally accepted as a female responsibility, and in many parts of the world the possibility that a normally potent male might be infertile is still not considered.” 21 Encyclopaedia Britannica, 397, 398. About 10% of the married population is involuntarily sterile, the causes for infertility divided about one-third to male factors, one-third to female and one-third to common difficulties.
We cannot' say how much scientific knowledge was available to the French scholars at the time of the adoption of the Code Napoleon. It is not likely that they were aware of the microscopic isolation of spermatozoa. But if the French and Louisiana lawmakers understood “l’impuissance” and “impotence” to mean “wholly lacking in sexual power,” as we think they must have, must we not conclude that they would also have forbidden disavowal for sterility of the male? The lawmakers did prohibit disavowal when the husband of the mother was unable to perform the sex act. Why, then, should we believe they would have permitted disavowal when the husband actually fulfilled the conjugal union by coitus? If we assume the 18th and 19th century lawmakers made a distinction between “impotence” and male sterility, as the father now urges us to do, we must nevertheless conclude that the greater includes the lesser. For the ancients, “impotence” was the greater disability. We can in no way attribute to the ancients even a suspicion that an impotent man was capable of procreation.
It has only been in the middle of the 20th century that enough data has been gathered to form a body of scientific knowledge concerning its nature. From the little that is now known, it is thought that impotence is not necessarily a constant condition in a male, and is not necessarily pathological in origin, but is a variable condition and often psychological in origin.
It is true that the husband’s allegation is that he “is unable physically and biologi *944 ■rally to produce spermatozoa.” If we treat this as a well pleaded fact, it could be argued that he should be allowed an opportunity to prove that fact in court. Three reasons militate against him. First, the public policy is against the attack on the paternity of the infant. The attack itself should be discouraged unless the likelihood of success is great. Second, the allegation is that the father is sterile (but not impotent) because of childhood diseases. The quality of proof required to sustain this conclusion (in the absence of surgical findings to which no hint is made) does not assure the success of the attack. Expert medical opinion evidence generally lacks the quality of certainty required to prove such a vital fact as parenthood. Third, since the husband has not alleged with particularity the “impediment to the natural maturity of petitioner’s reproductive system,” caused by the childhood diseases, we will treat his allegations as conclusions of the pleader, and not as material facts upon which his cause of action is based.
The same reasons for prohibiting disavowal of paternity for impotence seem to exist for prohibiting disavowal of paternity for sterility. If the scientific information available to lawyers and judges were clear and precise, to the effect that men are either sterile or fertile, with no degrees and shades of differences, it would be easy and perhaps sensible to conclude that our public policy should be different because we know so much more than the jurists of the early 19th century. If the state of the scientific knowledge were such that we could say without a doubt that this man is incapable of producing spermatozoa, then it might be justifiable for this court to make a change in the long-standing public policy of the State of Louisiana.
It may be that disavowal for “accidental impotence” as contrasted to “natural impotence” mentioned in C.C. 185 is not prohibited. As indicated by Planiol, supra, commentators were of the opinion that disavowal was not prohibited when the husband had suffered accidental or surgical emasculation, probably because of the quality of the evidence by which such “impotence” could be proved. Before us, however, is a husband who only contends that a childhood disease prevented his production of spermatozoa. In view of the prohibition against disavowal on account of impotence, we believe his attack on the paternity of the infant is prohibited by C.C. 185.
When we weigh the benign policy of the State toward innocent children against the mischief, scandal and difficulty of ascertaining the ultimate determinative facts, we conclude that it would be more appropriately a legislative function to change the policy of the State, if it is to be changed, at this time.
We hold that the prohibition of C. C. 185 against disavowal for “natural im *946 potence” also prohibits disavowal for sterility due to childhood disease.
The judgment of the Court of Appeal is affirmed.
SUMMERS, J., concurs in the decree.
BARHAM, J., dissents with written reasons.
TATE, J., is recused, having participated in these proceedings in a previous court.