272 So.2d 784 (1973)
John Robert ENTERKIN, Sr., Plaintiff-Appellee,
v.
In the Matter of a child named Angela Michelle DeVAUX, Defendant-Appellant.
No. 4049.
Court of Appeal of Louisiana, Third Circuit.
January 29, 1973.
Parker & Parker by Elodie K. Parker, Jena, for defendant-appellant.
Edwin R. Hughes, Jena, for plaintiff-appellee.
Before FRUGE, HOOD and DOMENGEAUX, JJ.
FRUGE, Judge.
This is an Action en Desaveu in which John Robert Enterkin has attempted to disavow Angela Michelle DeVaux, who was born October 2, 1971, almost two years from the date of plaintiff's legal separation from her mother.
On October 17, 1969, Mrs. Enterkin had filed suit against her husband for separation on grounds of abandonment. The matrimonial domicile was Jena, Louisiana. On November 17, 1969, a default was confirmed granting Mrs. Enterkin a separation. On January 25, 1971, Mrs. Enterkin filed suit for divorce on the grounds that she had been living separate and apart from her husband since the date of the separation.
On March 9, 1971, John Enterkin, plaintiff in this case reconvened asking for a divorce on grounds of "many acts of adultery and also that she was living in open adultery in the town of Jena". He also asked for custody of the children of the marriage because of her immoral life style and her neglect of the children. On March 6, 1972, Mrs. Enterkin was awarded a divorce and Mr. Enterkin was awarded custody of the minor children of the marriage, John Robert Enterkin, Jr., and James Gregory Enterkin, with Mrs. Enterkin having certain visitation rights.
This suit for disavowal was filed October 26, 1971, well within the six-month prescriptive period of R.C.C. Art. 191. Named as defendants were the child, Angela Michelle DeVaux, and her mother, Anaise DeVaux Enterkin. A preliminary default was entered on January 3, 1972, as to Mrs. Enterkin. On January 6, 1972, the default was confirmed. The suit against the child was also tried on January 6, 1972. *785 A judgment of disavowal in favor of John Robert Enterkin, Sr., and against Angela Michelle DeVaux and Anaise DeVaux Enterkin was rendered that same day.
On this appeal the curator argues that the trial court should have imposed a heavier burden of proof upon the plaintiff. We affirm.
Filed in evidence at the trial was the certificate of live birth of the minor child which showed that she was born at the Huey P. Long Charity Hospital in Pineville, Louisiana. The name of the father was left blank. The name of the child's mother was listed as Anaise Eva DeVaux. Mrs. Enterkin signed the birth certificate as Anaise Eva DeVaux. The mother of the child did not appear at the trial. The three-month old child was represented at the trial by her curator. Both John Enterkin, Sr. and his father, Willard Enterkin, testified at the trial. Because of Willard Enterkin's knowledge of the activities of both the plaintiff and Mrs. Enterkin, his testimony is entitled to great weight. He lived in Jena, Louisiana, where Mrs. Enterkin has resided almost continuously since the separation. He often accompanied John Enterkin when John went to the home of Mrs. Enterkin and her paramour to exercise his visitation rights (prior to the divorce), as well as seeing Mrs. Enterkin frequently around Jena. The plaintiff is Willard's only living child, and they enjoy a very close relationship. Thus Willard is very familiar with John's whereabouts and knows what he is doing almost constantly. John visits Willard often, and when he does not visit, Willard knows where he is and how to get in touch with him.
Willard testified that he knew of no instance when John Enterkin had lived with Mrs. Enterkin as man and wife. He stated that if such an incident had occurred, he would know about it. His testimony revealed the following facts. During the time that the child was conceived, John Enterkin lived in Monroe. He sublet part of the house he was living in to other people. Willard visited Monroe often and never saw Mrs. Enterkin there. The only time that Mrs. Enterkin went to Monroe during the time that John lived there was one instance in which she met John in a park (in the presence of their children) to discuss their divorce. Mrs. Enterkin has lived in LaSalle Parish at all times since the separation, except for one period when she supposedly went to school in Shreveport. John was not in Shreveport with her, and in fact, did not know that she was in Shreveport. Even if John had wanted to live with his wife after the separation, it would have been impossible because she had lived with Jessie Green nearly (apparently Jessie did not accompany her to Shreveport) continuously since the separation. In order to exercise his visitation rights, John would pick up his children at the residence of Mrs. Enterkin and Mr. Green and take them elsewhere. On nearly every occasion, Willard would accompany John. Every time Willard went, Mr. Green was there. On some occasions Mrs. Enterkin was not there, and Mr. Green would be taking care of the Enterkin children.
The plaintiff, John Enterkin, testified unequivocally that he is not the father of Angela Michelle DeVaux and that it would be impossible for him to be the child's father. He stated that he had not once lived with Mrs. Enterkin as man and wife since several months prior to the judicial separation of November 17, 1969. On vigorous cross examination, he testified that after the separation, (1) he never went to his wife's residence alone, (2) he never spent the night with her in another house or motel, (3) he has not been under the same roof with her or any place with her out of the company of other persons since some time before she filed her suit for legal separation, and (4) he has never acknowledged the child as being his child. Between December, 1970, and June, 1971, John was living in Ouachita Parish. During this time he saw his wife only once. This meeting occurred in a park in Monroe *786 around noon. There, in the company of their children, they discussed their divorce. At this time he did not know she was pregnant. When Mrs. Enterkin filed for a divorce in January of 1971, John thought she might be pregnant. However, he did not know of her pregnancy to a certainty until he observed her appearance at a conference in the trial judge's chambers during July or August of 1971. Mrs. Enterkin was living with Mr. Green at the time the child was born and at the time of the trial. John's first knowledge of her having delivered the child was obtained when Mr. Green stopped at Willard's house and told them Mrs. Enterkin had had a girl.
Willard Enterkin admitted on the stand that he could not account for Mrs. Enterkin's activities in every instance and that, therefore, there could have been an instance when Mrs. Enterkin traveled to Monroe. However, he did testify that from his knowledge of both the parties that he did not believe this had occurred. He also testified that Mrs. Enterkin had been living with Mr. Green almost continuously since the judicial separation.
The curator for the child contends on this appeal that in cases where the child is represented by a curator, the burden of proof should be greater than in ordinary cases. He argues that the plaintiff should have called the persons living with him in Monroe to testify that he had not lived with his wife at that time. He also argues that the plaintiff should have called his wife as she was within the range of subpoena. In effect, he is arguing that in cases such as this, the plaintiff must establish through the testimony of disinterested persons (or the testimony of the mother of the child) that it was physically impossible for him to have cohabited with his wife. We disagree.
Under the facts of this case, there is no presumption that the husband of the mother is the father of the child:
Art. 186. The child capable of living, which is born before the one hundred and eightieth day after the marriage, is not presumed to be the child of the husband; every child born alive more than six months after conception, is presumed to be capable of living.
"Art. 187. The same rule applies with respect to the child born three hundred days after the dissolution of the marriage, or after the sentence of separation from bed and board.
"Art. 188. The legitimacy of the child born three hundred days after the separation from bed and board has been decreed, may be contested, unless it be proved that there had been cohabitation between the husband and wife since such decree, because it is always presumed that the parties have obeyed the sentence of separation.

"But in case of voluntary separation, cohabitation is always presumed, unless the contrary be proved."
One case factually similar to the instant case found in the above articles a presumption that a child born 300 days or more after a legal separation is illegitimate. Singley v. Singley, 140 So.2d 546 (La. App. 1st Cir., 1962). Both Singley and Kaufman v. Kaufman, 146 So.2d 199 (La. App. 4th Cir., 1962), affirmed judgments allowing disavowal. Both cases have recently been discussed without disapproval by the Supreme Court. See Tannehill v. Tannehill, 261 La. 933, 261 So.2d 619 (1972).
We hold that in cases such as this there is no presumption that the husband of the mother is the father of the child. When a child is born 300 or more days after a legal separation has been granted, the husband of the mother is entitled to a judgment of disavowal, unless it be proved that there has been cohabitation betwen him and his wife since that decree was rendered. It is not necessary that the husband prove that there was no possible opportunity for cohabitation. *787 See Singley v. Singley, supra; and Kaufman v. Kaufman, supra.
In Singley, the plaintiff's wife had a child exactly 300 days after their judicial separation. The wife was not summoned and did not appear at the trial. She did file an answer (through the same attorney who represented her in the suit for separation for bed and board) in which she denied allegations of the plaintiff that there had been no sex relations or cohabitation between them and denied the article in plaintiff's petition in which he stated that he was not the father of the child. The wife did not offer testimony by any other witness at the trial.
The plaintiff proved by a birth certificate that the child was born 300 days from the date of the judgment of separation, and testified that there had been no reconciliation since the judicial separation. The plaintiff's brother, who lived with him testified that there had been no reconciliation whatsoever; but frankly stated that the plaintiff worked some nights at Gaylord, and he did not know what the plaintiff did every night. He admitted that it could have been possible that the plaintiff had seen his wife on one of the nights he was off. Another witness who knew both the plaintiff and his wife well testified that, to his knowledge, the plaintiff and his wife had never reconciled since the date of separation. However, the witness testified that it was possible that the plaintiff could have seen his wife after the separation without the witness's having known about it. He testified that he did not know what the plaintiff did when he went to see his children as he had not gone with him.
On appeal counsel for the child contended that the plaintiff "had not borne the burden of proof by a preponderance of the evidence", id. at 553 of 140 So.2d. The court found that it was clearly not shown that cohabitation was physically impossible. However, the mere fact that the father had exercised his visitation rights and visited the children in the home of his wife did not destroy the presumption of illegitimacy of a child born 300 days after the separation from bed and board. The court held that any presumption of cohabitation without proof of it would be in the teeth of Articles 187 and 188 and that:
"There must be proof of cohabitation between the husband and wife since the decree of separation from bed and board in order to destroy the presumption and deny the husband a judgment in a suit to contest the paternity of the child born 300 days after the separation of bed and board." id at 553-554.
In Kaufman v. Kaufman, 146 So.2d 199 (La.App. 4th Cir., 1962), the plaintiff's wife gave birth to a child 313 days after their judicial separation. The Action en Desaveu was joined with an action of divorce in which the defendant admitted that since the separation she had had no relationship whatever with the plaintiff. She also admitted she had had sexual relations with Jake Johnson, Sr. and that he was the father of the child, Jake Johnson, Jr. On the issue of disavowal the court held:
"When we come to consider the question of whether or not the plaintiff, Junius Kaufman, was the father of the child born 313 days after the separation, the record shows that there had been no relations of any kind between the plaintiff and the defendant for at least 313 days prior to the birth of that child. Since there had been a judgment of separation, the presumption of paternity resulting from Articles 186, 187 and 188 of our LSA-Civil Code no longer applied for these articles clearly provide that where there is a separation from bed and board `it is always presumed that the parties have obeyed the sentence of separation.' As a result of this presumption, that the sentence of separation has been obeyed, it will be presumed that a child born more than 300 days after the separation is not the child of the husband unless, in accordance with Article 188, `it be proved that there had been cohabitation *788 between the husband and wife since such decree.'" Kaufman v. Kaufman, 146 So.2d 199, 201 (La.App. 4th Cir., 1962). (Emphasis ours).
Heable v. Heable, 248 So.2d 847 (La. App. 2nd Cir., 1971) also involved a child born 300 days from the date of judicial separation. There, however, it was proven that the plaintiff had cohabited with his wife after the judicial separation and 247 days prior to the birth of the child. The Second Circuit held that since there had been cohabitation between 180 to 300 days of the birth of the child, R.C.C. Art. 188 did not apply and the husband of the mother was presumed to be the father of the child.
In the instant case there is no proof of cohabitation. The plaintiff has proven his case and is entitled to judgment. He was not required to secure Mrs. Enterkin's testimony. The child's curator represented Mrs. Enterkin in her separation and divorce. He was aware of all of the facts and the record shows that on the day of the trial, he was aware of the presumption in favor of Mr. Enterkin. The trial judge offered to hold the case open for either party to present additional testimony before final judgment was signed. The curator should have called Mrs. Enterkin if she could have testified that there had been cohabitation between herself and Mr. Enterkin. Mrs. Enterkin was served as a defendant in the suit for disavowal. The record shows that the curator performed his job admirably. He represented the child capably. He cross examined witnesses so strenuously and performed his job so well that at times counsel for plaintiff complained that he was making things difficult. The curator could have and would have had Mrs. Enterkin subpoenaed if he thought that she could have testified that there had been cohabitation.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to plaintiff-appellee.